

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Copies mailed 1/4/21 of Judge Davison

---

ZAIDA I. ROSADO,

                    Plaintiff,

        - against -

ANDREW SAUL,
*Commissioner of Social Security Administration*

                    Respondent.

**19 Civ. 8073 (PED)**

**DECISION AND ORDER**

---

**PAUL E. DAVISON, U.S.M.J.:**

## I.  INTRODUCTION

Plaintiff Zaida I. Rosada, *pro se*, brings this action pursuant to 42 U.S.C. § 405(g) challenging the decision of the Commissioner of Social Security ("Commissioner" or "agency") denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  [Dkt. 2.]  The matter is before me for all purposes pursuant to a Notice, Consent and Reference of a Civil Action to a Magistrate Judge entered on December 10, 2019.  [Dkt. 19.]  The Commissioner filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) on the grounds that the Administrative Law Judge's ("ALJ") determination that Plaintiff was not disabled and, therefore, not entitled to DIB or eligible for SSI, was supported by substantial evidence and based on a proper application of the relevant legal standards. [Dkt. 20, 21.]  Plaintiff filed a letter opposing the Commissioner's motion.  [Dkt. 25, 26-1.][1]  For the reasons that follow, the Commissioner's motion is **DENIED**, and the matter is remanded to the agency for further administrative proceedings.

---

[1]      Plaintiff filed a response in Spanish [Dkt. 25], of which the agency filed a certified translation.  [Dkt. 26-1.]

## II.  BACKGROUND

Plaintiff is a 56-year-old woman who alleges that she has been disabled from work since August 11, 2009.  [R. 264.][2]  Plaintiff worked as a hairdresser and a stocker at Wal-Mart.  [R. 279.]  Beginning in 2001 she worked as a nutritional program educator and a farm workers advocate.  [R. 62-63, 279.]  She was involved in a motor vehicle accident in 2004 injuring her back and neck.  [R. 322.]  An injury on August 11, 2009 exacerbated her condition.  [R. 458-59.]

Plaintiff alleges that she can no longer work due to back and neck injuries, which resulted in herniated discs and pinched nerves.  [R. 271, 275.]  She also reported asthma, depression, and anxiety.  [R. 286, 317.]  Plaintiff filed prior applications for DIB and SSI, which were denied in a separate ALJ hearing on June 24, 2011.  [R. 78-85.]  Therefore, the relevant period for the instant application commenced on June 25, 2011.  *See, e.g.*, *Pataro v. Berryhill*, No. 17 Civ. 6165 (JGK)(BCM), 2019 WL 1244664, at *11 (S.D.N.Y. Mar. 1, 2019), *report and recommendation adopted*, 2019 WL 1244325 (S.D.N.Y. Mar. 18, 2019) ("An ALJ may find that *res judicata* applies where the Social Security Administration has 'made a previous determination or decision' about a claimant's rights 'on the same facts and on the same issues or issues, and this previous determination or decision has become final by either administrative or judicial action.'") (internal citations omitted).[3]

### A.  Procedural History

Plaintiff protectively filed applications for DIB and SSI on November 19, 2014, alleging a disability beginning August 11, 2009.  [R. 236-49.]  Plaintiff's applications were denied, and

---

2       Notations preceded by "R." refer to the certified administrative record of proceedings relating to this case submitted by the Commissioner in lieu of an answer.  [Dkt. 16.]

3       Copies of unreported cases will be mailed to Plaintiff.

she requested a hearing before an ALJ. [R. 112-21.] Plaintiff appeared at a hearing before an ALJ on January 9, 2018 represented by counsel. [R. 37-71.] The ALJ denied Plaintiff's applications for the period of June 25, 2011 through February 15, 2018, the date of the decision. [R. 7-24.] Plaintiff filed a request with the Appeals Council to review the ALJ's decision, which was denied on July 12, 2019. [R. 1-6.] Plaintiff timely commenced the instant action on August 28, 2019. [Dkt. 2.]

**B.      Factual Background and Medical Evidence**

**1.      Medical Evidence Prior to the Application Period**

Dr. David Tucker conducted an independent medical examination on April 18, 2008 in connection with Plaintiff's application for Workers' Compensation. [R. 642-48.] He observed limitations in Plaintiff's neck range of motion, as well as tightness, tenderness, spasms, and pain in her shoulders and back. [R. 646.] He did not opine as to her ability to work and instead recommended that she continue treatment and obtain a neurological consultation. [R. 647.]

Plaintiff attended regular visits with her primary care physician, Dr. Alexander Gapay. She saw him on November 6, 2008, and Dr. Gapay referred to Plaintiff's injuries as dating back to her motor vehicle accident 2004. [R. 489.] Dr. Gapay assessed low back pain, herniated discs at L4-L5 and L5-S1, and a cervical spine sprain at C5-C6 with mild spinal stenosis, post-traumatic headaches, and obesity. [R. 489-90.] She next saw Dr. Gapay on January 10, 2009 for cold related symptoms. [R. 487-88.] On May 27, 2009, Plaintiff reported that she had tried to return to work recently but complained of worsening pain in her neck, back, and shoulders. [R. 485.] A physical examination revealed tenderness in Plaintiff's cervical spine and right shoulder and pain with movement. Dr. Gapay assessed disc herniations at L4-L5, L5-S1, C5-C6 and impingement of the right shoulder. [R. 486.]

Plaintiff injured herself at work on or around August 8, 2009 while trying to set up a tent when it broke. [R. 450.] She saw Dr. Gapay on August 13, 2009 and reported increasing pain in her back, neck, shoulders, and legs, numbness and tingling in her arms and legs, and difficulty walking. [R. 483.] A physical examination revealed tenderness in her cervical spine and diminished neck range of motion by 50 percent. [R. 484.] Plaintiff could flex her hip less than 25 percent of normal motion. She had marked pain and stiffness in her back with spasms radiating to her legs. Dr. Gapay referred Plaintiff to pain management. [R. 484.] Dr. Gapay's physical examination findings remained largely unchanged on August 20, 2009. [R. 481-82.] Dr. Gapay assessed worsening pain of the neck, upper back, and lower back with herniated discs at C5-C6, L4-L5, and L5-S1 and radiculopathy of the upper left and both of the lower extremities. Plaintiff also reported poor sleep and fatigue due to pain. Dr. Gapay opined that Plaintiff had a moderate to marked partial disability. [R. 482.]

Dr. Gapay referred Plaintiff to New York Spine Surgery & Rehabilitation where she attended an initial consultation with Dr. Kenneth Hansraj on August 24, 2009. [R. 316-24.] She reported increasing neck pain radiating to her left arm and back pain radiating to her legs, which was worse on the left side. [R. 316.] She also reported that she could walk between two to ten blocks with pain. [R. 317.] Dr. Hansraj noted prior diagnoses of anxiety and asthma. [R. 317.] He reviewed a February 4, 2008 cervical MRI showing a disc herniation as C5-C6 indenting the cervical cord with mild spinal stenosis. [R. 318.] A lumbar MRI taken the same day showed disc herniations at L4-L5 and L5-S1 causing impressions on the L4 and S1 nerves and impinging the L5 spinal nerve. [R. 391.] Dr. Hansraj recommended that Plaintiff use a back brace and sequential stimulation, that she avoid bending, lifting, twisting, and reaching, and that she try to walk as much as tolerable. [R. 324.] He also referred Plaintiff to obtain updated MRIs. [R.

4

324.] Dr. Hansraj saw Plaintiff at a follow-up visit on October 7, 2009. [R. 326-32.] A physical examination revealed diminished reflexes throughout Plaintiff's arms and legs and diminished motor power in her neck and lower back with pain. [R. 326-27.] Dr. Hansraj diagnosed cervical and lumbar spondylosis. [R. 330.]

Plaintiff returned to Dr. Gapay on November 11, 2009. [R. 479-80.] A physical examination showed pain and tenderness along the cervical, mid thoracic, and lumbosacral spine. Plaintiff also had positive straight leg raising ("SLR") tests on both sides.[4] Her hip flexion was reduced by 50 percent. Dr. Gapay assessed a herniated disc at C5-C6 and disc disease at L4-L5 and L5-S1. He opined that Plaintiff was 100 percent disabled. [R. 480.]

Plaintiff followed with Dr. Hansraj on December 14, 2009. [R. 333-42.] X-rays taken November 25, 2009 of the spine and neck showed a small left paracentral herniated nucleus pulposus ("HNP") at C5-C6. [R. 338-41.] Dr. Hansraj opined that Plaintiff was "partially, markedly disabled" and referred her for EMG studies. [R. 341.] On February 24, 2010, Dr. Hansraj reviewed Plaintiff's January 8, 2010 EMG nerve conduction study, which revealed left radiculopathy at C5-C6 and L5-S1, but no evidence of cervical neuropathy. [R. 351-54.] On March 14, 2010, Dr. Hansraj assessed lumbar degenerative disc disease. [R. 356-73.]

Dr. Gapay next saw Plaintiff on March 22, 2010. [R. 468-70.] He noted reduced motion in Plaintiff's neck and shoulders, and Plaintiff reported pain, numbness, and tingling in her left

---

[4]     "The straight leg raise test 'checks the mechanical movement of the neurological tissues as well as their sensitivity to mechanical stress or compression.' [G]enerally, in a straight-leg raising test, the patient is in the supine position with the knee and hip extended and there is passive dorsiflexion of the foot, where back pain indicates nerve root compression or impingement." *McIntosh v. Berryhill*, No. 17 Civ. 5403 (ER)(DF), 2018 WL 4376417, at *3 n.9 (S.D.N.Y. July 16, 2018), *report and recommendation adopted*, 2018 WL 4374001 (S.D.N.Y. Sept. 12, 2018) (citing *Stedman's Medical Dictionary* (updated November 2014) available on Westlaw at STEDMANS 908450).

hand, leg, and foot. Plaintiff had difficulty walking due to pain and needed assistance getting on and off of the examination table. She also had reduced range of motion in her hips. [R. 470.] These results were consistent with Plaintiff's next physical examinations on May 20, 2010 and July 15, 2010, and Dr. Gapay opined that Plaintiff was 100 percent disabled from her work as a nutrition educator and 75 percent disabled overall. [R. 461-67.]

Plaintiff attended a second independent medical examination in connection with her Workers' Compensation application, which was performed by Dr. Jerome Moga on August 9, 2010. [R. 638-40.] Dr. Moga observed diffuse low posterior cervical spine and left trapezius tenderness. Plaintiff could rotate her head 30 degrees to right and left. She was numb to pinprick testing in her upper and lower extremities. Plaintiff's grip strength was three pounds in her right hand and zero pounds in her left. Deep tendon reflexes were hypoactive in upper and lower extremities but equal bilaterally. She had positive SLR tests at 70 degrees on both sides, more on the left. Plaintiff had discomfort while forward bending at 10 degrees. Dr. Moga assessed cervical and lumbar spine herniated disc syndrome. He opined that Plaintiff had a moderate partial degree of disability. [R. 640.]

On December 10, 2010, Dr. Gapay observed that Plaintiff had difficulty walking, and he recommended physical therapy. [R. 458-60.] Dr. Gapay saw Plaintiff again on January 14, 2011. [R. 450-53, *repeated* R. 572-34.] He observed diminished range of hip motion, tenderness along Plaintiff's neck and back, and that Plaintiff could not heel-to-toe walk. He opined that Plaintiff was markedly, partially disabled. [R. 452.] On January 14, 2011, Plaintiff reported difficulty sleeping due to pain and discussed depressive symptoms. [R. 568-71.]

Plaintiff began seeing a neurologist, Dr. Surinder Jindal, on March 17, 2011. [R. 376.] Based on a neurological examination, Dr. Jindal assessed cervical muscle spasm with cervical

radiculopathy and lumbosacral radiculopathy.  He recommended a home exercise program and pain medication.  [R. 376.]

### 2.     Medical Evidence During the Application Period

Dr. Moga conducted a third Workers' Compensation independent medical examination on July 1, 2011.  [R. 650-62.]  He observed low posterior cervical spine tenderness and tenderness over the left trapezius muscle.  Plaintiff could rotate her head 45 degrees to the right and 30 degrees to the left.  She had diffuse numbness to pinprick testing in her upper and lower extremities.  Her right-hand grip strength was 25 pounds and 11 pounds in her left hand.  She had weak left foot dorsiflexion power.  Her SLR tests were positive at 60 degrees on the left and 70 degrees on the right.  She could bend forward no more than 20 degrees at the waist.  Dr. Moga opined that Plaintiff was moderately partially disabled and that she could perform light duty work with no lifting of over 25 pounds.  [R. 652.]

On December 13, 2011, Plaintiff saw Dr. Vicki Rogove after twisting her right ankle.  [R. 377-80.]  Plaintiff walked with a limp.  [R. 377.]  A physical examination showed tenderness of the right ankle with pain and swelling in the knee.  Dr. Rogove assessed a right ankle, foot, and knee sprain.  [R. 379-80.]  A pelvic radiological examination taken the same day showed no evidence of fracture or dislocation at the hips but did show mild degenerative osteoarthritic changes in both hip joints.  [R. 381.]

Plaintiff saw Dr. Jindal again on June 18, 2012.  [R. 383.]  Plaintiff reported neck pain and stiffness that intermittently worsened and was exacerbated by prolonged sitting and standing.  A neurological examination revealed decreased sensation in her lower back, tenderness and spasms in her upper back and neck, and decreased ability to lean to the side.  Dr. Jindal assessed cervical myofascial pain and lumbosacral radiculopathy.  He recommended pain management

and increased Plaintiff's dosage of baclofen to twice a day. He also prescribed Lodine to be taken twice daily. [R. 383.]

Plaintiff next saw Dr. Jindal on July 30, 2012. [R. 385.] Plaintiff again reported back and neck pain with burning. Trigger point injections relieved some of the pain, pressure, and burning, but Plaintiff's symptoms intermittently worsened over the last few weeks. A neurological examination revealed decreased sensation at L5-S1, tenderness and spasm in the paraspinal area, and positive SLR tests at 70 degrees on the right and 40 degrees on the left. Dr. Jindal assessed lumbosacral radiculopathy with recurrent muscle spasm. He recommended that Plaintiff continue pain management and back exercises, and that she should use muscle relaxants and anti-inflammatory medication as needed. [R. 385.] Dr. Jindal made similar findings at Plaintiff's next visit on September 10, 2012. [R. 387.]

On November 26, 2012, Plaintiff reported to Dr. Jindal that her symptoms were worsening. [R. 389.] She continued experiencing neck pain and stiffness, but also reported low back pain with prolonged sitting and standing, as well as more spasms due to cold weather. Dr. Jindal observed that Plaintiff had decreased sensation on the right at C5-C6 and L5-S1. Plaintiff also developed an abnormal gait and favored her right side while walking. Dr. Jindal observed spastic trigger points on the neck and upper back. He assessed cervical myofascial pain, cervicogenic headaches, and low back pain with lumbosacral radiculopathy. He opined that pain management was medically necessary and administered four trigger point injections, which Plaintiff stated improved her symptoms. [R. 389.]

On February 19, 2013, Plaintiff's symptoms continued to worsen. [R. 391.] She continued to present pain and stiffness in her back and neck. Dr. Jindal's neurological examination showed decreased sensation in her neck, and Plaintiff's gait was abnormal favoring

8

her left side.  She had tenderness and spasms in her neck and back at the L4-L5 region and paraspinal cervical and trapezius muscles.  She had positive SLR tests at 60 degrees on the left and 70 degrees on the right.  Dr. Jindal assessed cervical radiculopathy with headaches, and lumbosacral radiculopathy with radicular myofascial pain and recurrent muscle spasm.  [R. 391.] Dr. Jindal continued treating Plaintiff every two months through 2013 and consistently observed pain, stiffness, and tenderness in Plaintiff's back, neck and shoulders, an abnormal gait, and positive bilaterally SLR tests.  He administered trigger point injections during each visit which provided temporary relief.  [R. 393-99.]

Plaintiff saw Dr. Gapay on October 24, 2013 after having an asthmatic reaction to mold in her apartment.  [R. 446-49, *repeated at* R. 564-67.]  He assessed asthma and noted prior diagnoses of back pain and depression.  [R. 448-49.]  Plaintiff was not treated again until she saw Dr. Jindal on June 11, 2014.  [R. 401.]  Dr. Jindal observed continued tenderness, diminished deep tendon reflexes, and decreased sensation along Plaintiff's back and neck with positive SLR tests on both sides.  He administered three trigger point injections.  [R. 401.]  On September 22, 2014, Plaintiff reported to Dr. Jindal that she could not sit or stand for a prolonged period of time.  [R. 403.]  On October 21, 2014, Plaintiff reported worsening pain with numbness and tingling on the left side.  [R. 405.]  Dr. Jindal observed an abnormal gait favoring her right side. He also observed greater sensory impairments and more weakness, and he referred Plaintiff for an MRI.  [R. 405.]  An EMG study taken that same day showed chronic left L4-L5, L5-S1 and right S1 radiculopathy.  [R. 406-08.]  Over the next few months, Plaintiff continued treating with Dr. Jindal who observed similar physical findings and continued administering trigger point injections.  [R. 410-15, 420.]

On January 29, 2015, Plaintiff saw Dr. Gapay after she fainted on January 8. [R. 558-63.] Plaintiff stated she fainted when trying to get a cup of coffee in the morning, after which she was taken to the hospital. [R. 413-18, 436.] Dr. Gapay assessed dizziness and sweats with mild hypertension and chronic asthma. [R. 561.] Plaintiff next saw Dr. Gapay on January 30, 2015 for an annual wellness visit. [R. 436-440.] An echocardiogram taken that day showed trivial to mild pulmonary insufficiency, trivial tricuspid regurgitation, trivial mitral regurgitation, and a normal left ventricular size and contractility pattern. [R. 424-25.] Plaintiff noted that she had lost medical coverage, and soon she would no longer able to treat with Dr. Jindal. She had also stopped working and lost her house. [R. 436.] Upon physical examination, Dr. Gapay noted poor balance and left leg numbness. Plaintiff reported difficulty sleeping, anxiety, and depression. R. 437. She had positive SLR tests on both sides, worse on left. [R. 439.]

Plaintiff's final treatment with Dr. Jindal took place on February 25, 2015. [R. 492-93, 495-96.] An EMG of the upper extremities showed left C5-C6 and C6-C7 radiculopathy. A nerve conduction study was within normal limits. [R. 492.] Noting tenderness, pain, and spasms in Plaintiff's back and neck, as well as weakness and decreased reflexes and sensation in her upper and lower extremities, Dr. Jindal assessed cervical strain with radiculopathy, lumbosacral strain with lumbosacral radiculopathy, and degenerative disc disease. [R. 492-495.]

Plaintiff attended a physical consultative examination on April 3, 2015 with Dr. Richard Weiskopf, an agency medical consultant. [R. 497-501.] Plaintiff reported back and neck pain, asthma worse in the spring, headaches, and depression. [R. 497.] She stated she could cook and clean. At the time she lived with her son who did the laundry. She could shop and was able to shower and dress herself, but she needed help putting on her socks and shoes. During the day Plaintiff read and watched television. [R. 498.] Upon physical examination, Plaintiff was in no

acute distress but was tearful. Dr. Weiskopf observed that Plaintiff was mildly obese. Her gait was normal, but she could not walk on her heels or toes and could not squat. She had a normal stance and did not use assistive devices. She needed no help changing or getting on or off of the examination table. She was able to rise from chair without difficulty. [R. 498.]

Examination of Plaintiff's chest, head, neck skin, and face were normal. However, moving her neck caused tightness. Plaintiff could move her neck with flexion at 30 degrees, extension at 10 degrees, and lateral flexion at 10 degrees on the right and 20 degrees on the left. Rotary movement was 15 degrees on the right and 60 degrees on left. She had no scoliosis, kyphosis, or abnormality in her thoracic spine. Plaintiff's lumbar spine flexion was 20 degrees, and her lateral flexion was 10 degrees on left and 5 degrees on right. She had full extension and rotary movement bilaterally. She had positive SLR tests at 30 degrees bilaterally. However, Lasegue signs were positive on left and negative on right. Plaintiff had forward elevation of her shoulders at 105 on both sides. She had full range of motion of her elbows, forearms, and wrists, and she had flexion of both hips to 90 degrees. She had full range of her knees and ankles with no subluxations, contractures, ankylosis, or thickening. [R. 499.] Plaintiff's joints were stable and non-tender. She had no redness, heat, swelling, or effusion. Deep tendon reflexes were equal and physiologic in all extremities. She had no sensory deficit, and she had full strength in her hands and feet. She had no cyanosis, clubbing, edema, or atrophy in her extremities. [R. 500.] An x-ray taken that day showed lumbosacral levoscoliosis and degenerative changes. Pulmonary laboratory tests showed some restriction and obstruction. [R. 503-05.]

Dr. Weiskopf assessed chronic low back pain with left sciatic type pain distribution and herniated discs, chronic neck pain with cervical radiculopathy, asthma, and depression. [R. 500.] He opined that Plaintiff had no limitations in her ability to sit, stand, or walk. She had moderate

limitations in bending, lifting, climbing, and carrying. He opined that Plaintiff had good use of her hands for fine motor activities. [R. 500.]

Plaintiff also attended a mental consultative examination on April 15, 2015 with Dr. Dennis Noia, an agency psychiatric consultant. [R. 507-10.] Plaintiff stated that she drove herself to the examination. She had obtained a GED. At the time she was not working. She reported no psychiatric hospitalizations or outpatient treatment. [R. 507.] Plaintiff reported a history of herniated discs, pinched nerves, asthma, difficulty falling asleep, decreased appetite, and symptoms of depression. [R. 508.]

Upon examination, Dr. Noia observed that Plaintiff was appropriately dressed and appeared her age. She had an adequate manner of relating, social skills, and overall presentation. She had normal motor behavior and eye contact. [R. 508.] Plaintiff's speech was intelligible, fluent, and clear, and she had adequate expressive and receptive language. Her thoughts were coherent, and Plaintiff was goal directed with no evidence of delusions, hallucinations, or disordered thinking. Plaintiff had a constricted affect, somewhat reduced in intensity compared to her thoughts and speech. She had a depressed mood and appeared sad and tearful. Her senses were clear, and she had normal orientation. She was able to maintain concentration, and she could count, do simple calculations and perform serial threes. Plaintiff's recent and remote memory were intact. She demonstrated average intellectual functioning with an appropriate general fund of knowledge. She had good insight and judgment. She was able to dress, bathe, and groom herself, but needed help putting on socks and shoes. She stated she did not cook or prepare food and could not do general cleaning or laundry, and she would go shopping with her son. She could manage money and drive, but she did not use public transportation. During the day Plaintiff would read and watch television. [R. 509.]

Dr. Noia opined that Plaintiff had no limitations following simple instructions and directions, and she could perform simple and complex tasks. [R. 509-10.] Plaintiff had no limitations in maintaining attention and concentration, attending to a routine, or maintaining a schedule. [R. 510.] She had no limitations in her ability to learn new tasks or make appropriate decisions. She could relate to others and interact moderately well. She had moderate limitations in her ability to deal with stress, which was caused by psychiatric problems. He opined that Plaintiff's psychiatric problems "may at times significantly interfere with the claimant's ability to function on a daily basis." He recommended that Plaintiff pursue psychiatric care. [R. 510.]

Plaintiff began physical therapy on March 25, 2016. [R. 512-15.] George Giovannone, the physical therapist, observed that Plaintiff had decreased range of motion and strength, increased pain in her right shoulder, and her left ankle had decreased strength and increased pain. Plaintiff could walk up and down stairs and lift objects. However, she had decreased ambulation distance, and difficulty with stair climbing, lifting, overhead activity, and activities of daily living. [R. 513.] She had decreased range of motion in her left shoulder and decreased strength in her left ankle and right shoulder. [R. 513-14.] Mr. Giovannone opined that Plaintiff's impairments decreased her ability to walk, lift objects, perform overhead tasks, and perform activities of daily living including household tasks. [R. 514.]

Beginning April 4, 2016, Plaintiff met with Laura Ronen for nutritional counseling regarding Plaintiff's obesity. Plaintiff continued meeting with her approximately every two months through January 9, 2017. [R. 530-36, 540-41.]

Plaintiff saw Kelli Gassert, a physician assistant, on November 21, 2016. [R. 537-39.] An x-ray of the lumbar spine taken that day showed straightening of the lumbar lordotic curvature. [R. 529.] A physical examination showed normal gait, cervical spine and paraspinal

tenderness, and limited range of motion due to pain.  She assessed acute left-sided low back pain without sciatica, as well as cervicalgia. [R. 538.]

On November 28, 2016, Plaintiff saw Dr. Gapay after she strained her back trying to pick something up from the floor.  [R. 552-54.]  Dr. Gapay observed chronic pain in Plaintiff's cervical spine and left shoulder and pain and tenderness in her lumbosacral spine.  She had positive SLR tests on both sides.  [R. 552.]  Dr. Gapay assessed chronic pain, low back pain, sciatica of left side, cervicalgia, and left shoulder pain.  [R. 553.]

Plaintiff next met with Dr. Gapay on January 30, 2017.  [R. 549-51.]  He did not conduct a musculoskeletal examination that day, and instead assessed Plaintiff with obesity and a severe single current episode of major depressive disorder, as well as chronic tension-type headaches, sleep disorder, lumbago with sciatica on the left side, other chronic pain, polyarthralgia, cervicalgia, and pain in both shoulders.  Dr. Gapay noted that physical therapy failed and made the pain worse.  [R. 550.]  Plaintiff next saw Dr. Gapay on June 7, 2017 and reported that her pain continued to worsen.  [R. 545-48.]  Plaintiff reported worsening pain on July 14, 2017, and Dr. Gapay's physical examination continued to show muscle tenderness, decreased range of motion in her spine, and positive SLR tests on both sides.  [R. 542-43.]

Plaintiff saw Dr. Vijay Pampana at Middletown Medical on August 2, 2017.  [R. 576-78.] A physical examination showed tenderness of the left trapezius muscle, a positive SLR test on the left side, and pain with hip movement.  He assessed lumbar and radiculopathy.  [R. 577-78.]

In a letter dated August 16, 2017, Dr. Stanley Goldstein, a psychologist, stated that he had been meeting with Plaintiff on a weekly basis since January 22, 2016.  [R. 592, *repeated at* R. 626.]  Dr. Goldstein submitted handwritten treatment notes from January 22, 2016 through November 2, 2017.  [R. 595-625, 627-30.]  He treated Plaintiff for generalized anxiety disorder

and dysthymic disorder.  [R. 592.]  He completed a Psychiatric Assessment for Determination of Employability on March 24, 2016.  [R. 580-81.]  He noted diagnoses of generalized anxiety disorder and dysthymic disorder.  [R. 580.]  Plaintiff had no hospitalizations, emergency room visits, substance abuse, black outs, violent actions towards others or herself, or loss of a job or failure to complete education or training program due to psychiatric impairments.  She had no suicide attempts but had suicidal ideation.  Dr. Goldstein noted occasional decompensation "to a degree."  [R. 581.]

He opined that Plaintiff's psychological impairments would frequently interfere with her activities of daily living, and that Plaintiff could not participate in work related activities.  When asked when she could return, he stated, "uncertain if ever."  He found no evidence of limitations in her ability to understand and remember simple instructions, maintain socially appropriate behavior, and maintain basic standards of personal hygiene and grooming.  He opined that Plaintiff was moderately limited in her ability to understand and remember complex instructions, maintain attention and concentration, interact appropriately with others, and perform low stress, simple tasks.  She was very limited in her ability to use public transportation.  [R. 581.]

3.   **Agency Medical review**

Dr. T. Bruni, an agency medical psychiatric expert, reviewed Plaintiff's application on April 23, 2015.[5]  [R. 101-11.]  He did not review Plaintiff's psychiatric records, which post-dated his assessment, and opined that Plaintiff had no severe mental impairment.  [R. 105-06.]  He

---

[5]      Dr. Bruni was designated with Medical Specialty Code 38, which refers to psychology.  *See* Program Operations Manual System ("POMS") DI 24501.004.

declined to opine on Plaintiff's RFC.  There was no agency medical expert review of Plaintiff's physical medical treatment history.[6]

### 4.  Plaintiff's Testimony

Plaintiff testified at the January 9, 2018 hearing before the ALJ.  [R. 37-71.]  At the time of the hearing, Plaintiff lived in an apartment in Middletown, New York.  [R. 41.]  She had lived alone for the past two months and used to live with her adult son.  [R. 41-42.]  She was 53 years old at the time of the hearing. [ R. 42.]  Plaintiff stated she could drive, but someone drove her to the hearing that day.  [R. 43.]  Her apartment was a second-floor walk-up.  [R. 43.]  Plaintiff had obtained a GED and went to beauty school.  [R. 44-45.]  She was not working at the time of the hearing, and she last worked around September 2009.  [R. 45.]

Plaintiff stated she could not work due to back problems caused by a car accident in 2004, which caused pain in her upper and lower back and in her legs.  [R. 46.]  She could not lift more than 3 pounds. [ R. 46.]  She reported pain in her neck and arms and migraines.  [R. 47.]  She had a pinched nerve in her back on the right side and herniated discs.  [R. 47-48.]  She attended physical therapy for nine weeks, which increased her pain.  [R. 48.]  She took pain medication, which helped but caused fatigue.  [R. 48-50.]  Plaintiff had been seeing a psychologist for about a year on a weekly basis.  [R. 50-51.]

Plaintiff testified that she had trouble performing household chores and that a friend may visit her two or three times a week to help with cleaning, shopping and laundry.  [R. 51-53.]  Plaintiff did not attend church, and she was separated from her husband.  [R. 52.]  She stated she

---

[6]     A. Slattery, an agency "single decision maker" reviewed Plaintiff's medical records. "SDMs are non-physician disability examiners who may make the initial disability determination in most cases without requiring the signature of a medical consultant…. Accordingly, '[a]n SDM assessment is not a medical opinion for the purposes of appeals." *Rivera v. Comm'r of Soc. Sec.*, 394 F. Supp. 3d 486, 494–95 (S.D.N.Y. 2019) (internal citations omitted).

could not lift her groceries because they were too heavy. [R. 53.] Plaintiff stated she could do her own banking and budgeting. [R. 54.] She had not traveled in the past nine years. [R. 54.] Plaintiff liked to read in her spare time. [R. 54.] She stated she could not exercise, walk, or perform stretches. [R. 54-55.] Her pain had been getting worse since her injury and as she got older. [R. 55.] She also stated she had anxiety and depression. [R. 55.] She believed she could stand for 10 to 15 minutes before needing to sit and could sit for 10 to 15 minutes before needing to change positions. [R. 56-57.] Her anxiety and depression prevented her from being able to sleep most nights. [R. 57-58.] Her medication made her feel tired and also lowered her motivation. They also caused stomach issues and diarrhea. [R. 58.]

Plaintiff last worked as a nutrition program educator working for the state of New York from 2001 to 2009. [R. 59-61.] Her job required her to cook, travel, and grocery shop for families and teach them about nutrition. [R. 59-60.] In 2006 she also worked for an organization named PathStone where she would travel to farms and work with farm workers, teaching them about their legal rights. [R. 61-62.] Before that, she worked as a hairdresser and as a stocker in Wal-Mart. [R. 62-63.]

### 5.    Vocational Expert Testimony

Vocational expert Josiah Pearson also testified at the January 9, 2018 hearing. [R. 59, 63-68.] Mr. Pearson classified Plaintiff's work at Wal-Mart as a store laborer, listed under the *Dictionary of Occupational Titles* ("DOT") under DOT 922.687-058, an unskilled job performed at the medium level of exertion. He identified Plaintiff's work as a hairdresser under DOT 332.371-018, a skilled job performed at the light level of exertion. He identified Plaintiff's work with farm workers as an outreach worker or case aide under DOT 196.367-010, a semi-skilled job performed at the light level of exertion. He classified Plaintiff's work for the state as a food

17

management aide under DOT 195.367-022, a semi-skilled job performed at the light level of exertion. [R. 63-64.]

The ALJ asked Mr. Pearson to consider whether a person with Plaintiff's vocational profile and work history could perform certain jobs given various hypothetical levels of functioning. First, the ALJ asked him to consider an individual who could perform medium work with only occasional stooping who could not be exposed to concentrated respiratory irritants. Mr. Pearson opined that such an individual could perform work as a case aide, a food management aide, and a hairdresser. [R. 64.]

Next, the ALJ asked Mr. Pearson to consider the same hypothetical, but with the additional limitation of only occasional interactions with the public. Mr. Pearson opined that this individual could not perform work as a case aide, food management aide, or hairdresser. He opined, however, that they could perform the following unskilled jobs: hand packager, DOT 920.587-018; laundry laborer, DOT 361.687-018; and cleaner, DOT 919.687-014. [R. 65.]

The ALJ asked Mr. Pearson to consider a hypothetical individual limited to light work and occasional stooping who needed to avoid concentrated respiratory irritants, and without any mental limitations. Mr. Pearson opined that this individual could work as a food aide, case management aide, and hairdresser. Those jobs could be performed if the individual needed to stand and stretch every hour. The jobs could not be performed if the individual was limited to only occasional interaction with the public. An individual with that added social limitation could perform the following unskilled jobs: small products assembler, DOT 706.684-022; mail clerk, DOT 209.687-026; and routing clerk or router, DOT 222.587-038. [R. 65-67.]

Finally, the ALJ asked Mr. Pearson to consider an individual limited to sedentary work with no more than occasional stooping who could not be exposed to respiratory irritants, and

who needed the opportunity to stand up and stretch for a few minutes every hour.  Mr. Pearson

opined that such an individual would not be able to perform Plaintiff's past work but could

perform the following unskilled jobs: order clerk, DOT 209.567-014; document preparer, DOT

249.587-018; and final assembler, DOT 713.687-018.  [R. 67.]  The ALJ asked Mr. Pearson to

add a limitation of being unable to lift or carry five pounds and needing to change from sitting to

standing in 15-minute intervals.  Mr. Pearson opined that such an individual would not be able to

work.  Additionally, he testified that an individual off-task for more than 25 percent of the day

was not competitively employable in the national economy.  [R. 67-68.]

## III.  LEGAL STANDARD

### A.    Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the

pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

42 U.S.C. § 405(g).  "It is not the function of a reviewing court to decide de novo whether a

claimant was disabled."  *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  Rather, the court's

review is limited to "determin[ing] whether there is substantial evidence supporting the

Commissioner's decision and whether the Commissioner applied the correct legal standard."

*Poupore v. Astrue*, 566 F.3d 303, 305 (2d Cir. 2009) (per curiam).

The substantial evidence standard is even more deferential than the "clearly erroneous"

standard.  *Brault v. Social Sec. Admin*, 683 F.3d 443, 448 (2d Cir. 2012).  The reviewing court

must defer to the Commissioner's factual findings, and the Commissioner's findings of fact are

considered conclusive if they are supported by substantial evidence.  *See* 42 U.S.C. § 405(g).

"Substantial evidence" is "more than a mere scintilla" and "means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotations omitted) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotations omitted). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in light of the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (made applicable to Title XVI by 42 U.S.C. § 1383(c)(3)); *Shalala v. Schaefer*, 509 U.S. 292, 297 (1993); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). A remand for further proceedings may be ordered pursuant to the fourth sentence of 42 U.S.C. § 405(g) in cases where the Commissioner "has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the law and regulations." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (U.S. 1991); *see Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).

**B.     The Five Step Sequential Analysis**

A claimant is disabled under the Social Security Act when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. §

423(d)(1)(A). In addition, a person is eligible for disability benefits under the Social Security

Act only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.
> Id. § 423(d)(2)(A).

A claimant's eligibility for SSA disability benefits is evaluated pursuant to a five-step

sequential analysis:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

Rolon v. Commissioner of Soc. Sec., 994 F. Supp. 2d 496, 503 (S.D.N.Y. 2014); see 20 C.F.R. §§

404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v). The claimant bears the burden of proof as to the

first four steps of the process. See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).

If the claimant proves that his or her impairment prevents him or her from performing his past work, the burden shifts to the Commissioner at the fifth and final step. *See id.* At the fifth step, the Commissioner must prove that the claimant is capable of obtaining substantial gainful employment in the national economy. *See Butts v. Barnhart*, 416 F.3d 101, 103 (2d Cir. 2005); 20 C.F.R. § 404.1560(c)(2).

A claimant's "residual functional capacity" ("RFC") is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, *2 (July 2, 1996)). When assessing a claimant's RFC, an ALJ is obligated to consider medical opinions on a claimant's functioning based on an assessment of the record as a whole. 20 C.F.R. §§ 404.1527(d)(2), 416.9527(d)(2) ("Although we consider opinions from medical sources on issues such as …your residual functional capacity…the final responsibility for deciding these issues is reserved to the Commissioner."). It is the Commissioner's role to weigh medical opinion evidence and to resolve conflicts in that evidence. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").

## C.  Weighing Medical Evidence[7]

When considering the medical opinion evidence, the ALJ must give deference to the opinions of a claimant's treating physicians. A treating physician's opinion will be given

---

[7]  On January 18, 2017, the Commissioner published the "Revisions to Rules Regarding the Evaluation of Medical Evidence," effective March 27, 2017. 82 FR 5844-01, 2017 WL 168819 (Jan. 17, 2017). The Revisions altered certain longstanding rules for evaluating medical opinion evidence for cases filed after March 27, 2017. *Id.* at *5844. Plaintiff protectively filed her applications on November 19, 2014, and, therefore, the Revisions do not apply to this case. I note where applicable citations to abrogated regulations and social security rulings that were in effect at the time of Plaintiff's application.

controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 416.927(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider the following factors to determine the amount of weight the opinion should be given: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area, and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(2)-(6); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.") (citing *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam)). As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2d Cir. 2004).

## IV.  DISCUSSION

### A.    The ALJ's Decision

By decision dated February 21, 2018, the ALJ found that Plaintiff had not been under a disability from August 11, 2009 through the date of her decision. [R. 7-24.] The ALJ

acknowledged the Commissioner's prior decision dated June 24, 2011 denying Plaintiff's applications for benefits and limited her decision to June 25, 2011. [R. 11.]

At the first step of the sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her August 11, 2009 alleged onset date. [R. 13.] At the second step, the ALJ found the following severe impairments: obesity, degenerative disc disease of the lumbar spine, mild levoscoliosis of the lumbar and cervical spine, radiculopathy, and asthma. She determined that Plaintiff had no severe mental impairments. [R. 13-14.] At the third step, the ALJ found that Plaintiff's impairments did not meet a listing in 20 C.F.R. Part 404, Subpart P Appendix 1 ("Listings"). [R. 14.] Next, the ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform the full range of light work, except she was limited to only occasional stooping and needed to avoid respiratory irritants. The ALJ found no mental limitations. [R. 14-18.] At the fourth step, the ALJ determined that Plaintiff could perform her past work as a case aide, food aide, and hairdresser. [R. 18.] The ALJ found that Plaintiff was, therefore, not disabled, and the ALJ did not proceed to the fifth step. [R. 18.]

**B.    Plaintiff's Allegations of Additional Impairments are Inappropriate at this Stage of the Review Process**

In her response to the Commissioner's motion, Plaintiff submitted a letter providing a brief summary of her impairments and treatment history beginning with her motor vehicle accident in 2004. [Dkt. 25, 26-1.] However, Plaintiff also stated that at some point she was diagnosed with diabetes and treated for breast cancer. *Id.* The medical evidence before the ALJ and before this Court made no such references.

In general, *pro se* pleadings should be liberally construed, including in Social Security matters. *Nunez v. Saul*, No. 19 Civ. 0170 (PED), 2020 WL 3962046, at *4 (S.D.N.Y. July 13, 2020) (citing *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006)). There are

special rules concerning the submission of new evidence that was not before the ALJ.  Generally, evidence not contained in the administrative record may not be considered by a district court when reviewing the findings of the Commissioner.  *Clark v. Saul*, 444 F. Supp. 3d 607, 625 (S.D.N.Y. 2020).  A court may remand a case to allow additional evidence to be considered by the Commissioner, but only upon a showing that the new evidence is material and that there was good cause for the failure to incorporate the evidence into the record at the prior proceeding.  *Id.*

Plaintiff has not done so here.  It may be true that Plaintiff suffers from additional diagnoses and impairments, but no such evidence has been presented here, and Plaintiff shows no good cause for the failure to present any such records, to the extent they may exist.  However, Plaintiff will have the opportunity to submit any new evidence to the Commissioner upon remand.  20 C.F.R. §§ 404.977(e)(2), 416.1477(e)(2), 404.983, 416.1483.

**C.    The ALJ's Application of the Special Technique to Evaluate Mental Impairments at the Second and Third Steps Was Not Supported by Substantial Evidence**

At the second step of the sequential analysis, the ALJ found that Plaintiff did not have a severe mental impairment, despite her diagnoses of generalized anxiety disorder and dysthymic disorder.  As a result, the ALJ did not evaluate whether Plaintiff's mental impairment satisfied the Listing requirements at the third step.  [R. 13-14.]

The second step of the sequential analysis is intended to "screen out the very weakest cases."  *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014).  An ALJ must determine whether an impairment is "severe" or merely *de minimis*.  *Id.*  An ALJ may decide that an impairment is not severe only "if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  *Mezzacappa v. Astrue*, 749 F. Supp. 2d 192, 205 (S.D.N.Y. 2010).

The Commissioner promulgated specific regulations governing the evaluation of the severity of mental impairments, known as the "Special Technique." 20 C.F.R. §§ 404.1520a; 416.920a; *see Urena v. Comm'r of Soc. Sec.*, 379 F. Supp. 3d 271, 282 (S.D.N.Y. 2019). First, the ALJ must evaluate the medical evidence to determine the existence of a medically determinable mental impairment. *Id.* §§ 404.1520a(b)(1), 416.920a(b)(1). If a claimant has such an impairment, the ALJ must rate the degree of functional limitations resulting from the impairments in four broad areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentration, persistence, or maintaining pace; and (4) adapting or managing oneself. *Id.* §§ 404.1520a(b)(2), 416.920a(b)(2). If the limitations are no more than mild, the ALJ may conclude that the mental impairment is not severe, unless evidence otherwise indicates that there is more than a minimal limitation in a claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). If the claimant's mental impairment is severe, the ALJ must compare the relevant medical findings and functional limitations to Listing requirements at the third step. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2).

Here, the ALJ's application of the Special Technique was not supported by substantial evidence. The ALJ acknowledged diagnoses of affective and anxiety disorders. [R. 13.] However, the ALJ found that these impairments were not severe because they caused no more than mild limitations in Plaintiff's areas of functioning.

The ALJ found that Plaintiff had no limitations in her ability to interact with others based on Plaintiff's statement at the January 9, 2018 hearing that she has "lots of friends." [R. 13, *referring to* R. 51.] Though Plaintiff stated she had friends, not "lots of friends," who would visit her during the week, the ALJ takes Plaintiff's statement out of context, when viewed against Plaintiff's remaining testimony and the medical evidence. *See, e.g. Craig v. Comm'r of Soc. Sec.*,

218 F. Supp. 3d 249, 265 n.12 (S.D.N.Y. 2016) (finding it impermissible where the ALJ took the plaintiff's statements regarding her activities of daily living out of context).

Plaintiff testified that she had limited social interaction on a regular basis. She testified that she lived alone, but her friends may visit her twice a week to help with shopping, chores, and laundry. [R. 51-53.] She stated that she was separated from her husband and that her adult son had moved out of the house. [R. 52, 498.] She did not belong to a church, nor had she traveled in the past nine years. [R. 52-54.] She stated she spent most of her time alone at home reading or watching television. [R. 54, 498.] Viewing the testimony as a whole, it is apparent that Plaintiff testified that she had limited interactions with others.

Additionally, the ALJ's assessment ignored medical opinion evidence. *See Pagan v. Chater*, 923 F. Supp. 547, 556 (S.D.N.Y. 1996) ("the ALJ cannot ignore the medical evidence provided by a treating physician."). In fact, when determining Plaintiff's ability to interact with others at the second step, the ALJ did not refer to the medical evidence at all. [R.13.] For example, the ALJ made no reference to Dr. Goldstein's opinion that Plaintiff was moderately limited in her ability to interact appropriately with others. [R. 581.]

Next, the ALJ found that Plaintiff had no more than mild limitations in her concentration, persistence, or pace, relying on Dr. Noia's finding that Plaintiff had intact concentration and that she liked to read. [R. 13.] The ALJ again failed to consider Dr. Goldstein's functional assessment that Plaintiff was moderately limited in her ability to understand and remember complex instructions and maintain attention and concentration. [R. 581.]

Lastly, the ALJ found that Plaintiff had no more than mild limitations in her ability to adapt and manage herself. He based this finding on Plaintiff's statements to Dr. Noia that she lived alone and could purportedly cook, clean, shop, and perform self-care. [R. 13.] Dr. Noia

actually found just the opposite: he opined that Plaintiff had moderate limitations in her ability to deal with stress, and that those limitations were caused by psychiatric problems, which "may at times significantly interfere with the claimant's ability to function on a daily basis." [R. 510.] Dr. Noia's assessment was consistent with Dr. Goldstein's opinion, who stated that Plaintiff's psychological impairments would frequently interfere with her activities of daily living. [R. 581.] Plaintiff also testified that she could not perform daily activities without assistance from others. [R. 51-53.]

The ALJ's findings as to the Special Technique were thus not supported by substantial evidence when viewing the record as a whole. As a result of the ALJ's finding that Plaintiff had no severe mental impairments at the second step, the ALJ declined to consider Plaintiff's mental diagnoses at the third step. [R. 14.] To the extent that Plaintiff's mental impairments are found to be severe, declining to conduct the Listing analysis at the third step would also be an error. *See* 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). Accordingly, the ALJ did not properly apply the correct legal standards, and her finding was unsupported.

**D.    The ALJ's Physical RFC Finding is Not Supported by Substantial Evidence**

The ALJ's determination that Plaintiff could perform the full range of light work, with the added limitation of only occasional stooping, was not supported by substantial evidence. The full range of light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.1567(b), 416.967(b). The Commissioner's Social Security Rulings clarify that "frequent" means occurring from one-third to two-thirds of the time during an eight-hour

workday.  SSR 83-10, Soc. Sec. Rep. Serv. 24, at *6 (S.S.A. 1983).  Additionally, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." *Id.*

The ALJ's finding that Plaintiff could perform "substantially all" of the activities required to perform light work was not supported by substantial evidence.  For example, on December 10, 2010, Dr. Gapay, Plaintiff's primary care physician, opined that Plaintiff was markedly disabled and observed Plaintiff's inability to walk, as well as pain and decreased range of motion of her back, neck, and shoulders.  [R. 452, 461-67, 480.]  He opined on multiple occasions that Plaintiff was completely disabled from working.

The ALJ gave Dr. Gapay's opinion little weight.  [R. 17.]  The ALJ noted these opinions were all dated prior to the current application period.  *Id.*  However, the ALJ did not consider that Dr. Gapay continued treating Plaintiff during the current application period, and his findings, based on physical examinations, showed that Plaintiff's condition was worsening.  For example, Dr. Gapay's next physical examination of Plaintiff took place on January 29, 2015, where he observed leg numbness and poor balance with positive SLR testing.  [R. 439.]  He observed worsening pain and back sprain at their next visit on November 28, 2016.  [R. 552-54.]  He noted the following January that Plaintiff had attended physical therapy, which made her symptoms worse.  [R. 549-51.]  The ALJ was required to review the medical evidence in light of the record as a whole, which she failed to do, choosing instead to focus on specific records pre-dating the relevant period.

Furthermore, Dr. Gapay's treating source opinion was supported by substantial evidence from the record.  Plaintiff treated with Dr. Jindal who consistently assessed pain based on physical examinations, as well as observations of tenderness, spasms, and abnormal gait.  As a

result, he continually administered trigger point injections, which provided no more than temporary relief. [R. 383-99.] In fact, in 2014, Plaintiff continued reporting worsening pain, as well as numbness, tingling, and weakness, and Dr. Jindal again noticed an abnormal gait. [R. 401-08, 410-14.] Dr. Jindal's findings support Dr. Gapay's opinion and undercut the ALJ's RFC findings. The ALJ also gave little wait to Dr. Gapay's opinion due to Plaintiff's allegedly "conservative treatment." [R. 17.] In light of Plaintiff's extensive treatment with Dr. Jindal, the ALJ's characterization of Plaintiff's treatment was improper.

The ALJ also ignored the opinion of Plaintiff's physical therapist, George Giovannone. As a physical therapist, Mr. Giovannone is not an "acceptable treating source" under the Commissioner's regulations, and therefore is not entitled to controlling weight. *See, e.g., Brush v. Berryhill*, 294 F. Supp. 3d 241, 257 (S.D.N.Y. 2018) ("[A] physical therapist is not an acceptable medical source."). However, the ALJ is still obligated to consider medical evidence even from non-medical professionals such as physical therapists. SSR 06-03P, 2006 WL 2329939, *3 (S.S.A. Aug. 9, 2006) ("Opinions from these medical sources ... should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.").[8]

Physical therapy records may also constitute substantial evidence, which an ALJ is obligated to consider when reviewing the record as a whole. *Ortiz v. Saul*, No. 19 Civ. 942 (ALC), 2020 WL 1150213, at *7 (S.D.N.Y. Mar. 10, 2020) ("Although physical therapists are not acceptable medical sources, the opinions of physical therapists may constitute substantial evidence where the opinions are well documented and supported by the medical evidence.").

---

[8]   Abrogated by the Revisions to Rules Regarding the Evaluation of Medical Evidence, but effective at the time Plaintiff filed.

Here, Mr. Giovannone opined that Plaintiff had decreased ambulation distance and difficulty ascending stairs, lifting, performing overhead activities, and performing her activities of daily living. [R. 513-14.] These findings support Dr. Gapay's treating source opinion and go against the ALJ's physical RFC finding.

Dr. Gapay's findings are also supported by Dr. Moga's August 9, 2010 opinion, to which the ALJ gave some weight. [R. 17, referring to R. 638-40.] In general, disability determinations made for Workers' Compensation are not afforded controlling weight because the standards for Workers' Compensation disability are different from those under the Social Security Act. *Brodie v. Comm'r of Soc. Sec.*, No. 19 Civ. 6968 (PAE)(RWL), 2020 WL 5754607, at *7 (S.D.N.Y. Aug. 25, 2020), *report and recommendation adopted sub nom.*, 2020 WL 5775234 (S.D.N.Y. Sept. 28, 2020). Nevertheless, an ALJ may still rely on the opinion of a Workers' Compensation examiner. *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 492 (S.D.N.Y. 2018). Here, the ALJ gave no reason as to why Dr. Moga's opinion that Plaintiff was moderately disabled was given "some weight." [R. 17.] Instead, Dr. Moga's opinion, as the opinions of the other medical and non-medical sources, conform to Dr. Gapay's opinion.

In support of her RFC finding and her rejection of Dr. Gapay's treating source opinion, the ALJ relied, in part, on the opinion of the consultative examiner, Dr. Weiskopf, to whom the ALJ gave great weight. [R. 17, referring to R. 497-501.] With regard to lifting, Dr. Weiskopf actually opined that Plaintiff had moderate limitations in her ability to lift and carry. [R. 500.] His opinion, therefore, does not support to the ALJ's finding that Plaintiff could lift up to 20 pounds, or that she could carry 10 pounds for two or three hours in an eight-hour workday. In terms of lifting, therefore, Dr. Weiskopf's opinion lends further support to Dr. Gapay's treating source opinion. Thus, based on the record as a whole, substantial evidence does not support the

ALJ's finding as to Plaintiff's ability to lift. In light of the record as a whole, Dr. Gapay's opinion was well-supported by medical evidence and consistent with the record. The ALJ, therefore, did not properly defer to his opinion in light of the treating physician rule. *See Shaw v. Chater*, 221 F.3d at 134.

There is similarly insufficient support for the ALJ's finding that Plaintiff met the walking requirement for light work. Here, ALJ relied on Dr. Weiskopf, who opined that Plaintiff had no limitations in her ability to walk. [R. 17, referring to R. 500.] This reliance was improper. A consultative examiner is not a treating source, and instead provides a one-time examination, serving as a "snapshot" of a claimant's abilities and physical condition on a particular day. "Because the consultative sources . . . only evaluated Plaintiff on one occasion each, their evaluations 'convey[ ] only a snapshot of Plaintiff's symptoms on the day of the examination or, at most, for a brief period close to that time,' in contrast to the reports of the treating physicians, whose opinions reflected Plaintiff's condition over the course of months or years. *Mahon v. Colvin*, No. 15 Civ. 2641 (PKC), 2017 WL 1232471, at *16 (E.D.N.Y. Mar. 31, 2017). To the extent there exists a conflict between a treating source and a consultative examiner, the conflict should be resolved in favor of the treating physician. *Cabreja v. Colvin*, No. 14 Civ. 4658 (VSB), 2015 WL 6503824, at *30 (S.D.N.Y. Oct. 27, 2015).

Here, Dr. Weiskopf's opinion that Plaintiff had no limitations in her ability to walk was dramatically opposed to the record as a whole, including the opinions of Dr. Gapay, Dr. Jindal, Dr. Moga, and Mr. Giovannone, as well as the consistent physical examinations showing abnormal gate, positive SLR tests, limited range of motion, pain, spasms, and loss of strength. Dr. Weiskopf's opinion was also contradicted by his own physical examination, insofar as he found that Plaintiff could not walk on her heels and toes, and she could not squat. [R. 498.]

These limitations in Plaintiff's ability to walk cannot be reconciled with Dr. Weiskopf's opinion that Plaintiff had no limitations in her ability to walk.

In further support of her finding that Plaintiff could walk and stand for six hours in an eight-hour workday, the ALJ referred to instances where Plaintiff displayed a normal gait. [R. 15-17.] This was improper. It is true that Plaintiff demonstrated a normal gait on several occasions, including during Dr. Weiskopf's examination. However, Plaintiff also demonstrated an abnormal gait throughout the relevant period. [*see, e.g.*, R. 389, 391, 405.] The ALJ, in effect, cited only the evidence to support her desired RFC finding while ignoring the substantial evidence supporting a greater degree of limitations. The ALJ is not entitled to "cherry-pick" evidence in this manner. *Annabi v. Berryhill*, No. 16 Civ. 9057 (BCM), 2018 WL 1609271, at *16 (S.D.N.Y. Mar. 30, 2018) ("[A]n administrative law judge may not 'cherry-pick' medical opinions that support his or her opinion while ignoring opinions that do not.") (internal citations omitted). Moreover, having a normal gait is not indicative of having the ability to walk for six hours in an eight-hour workday. *See, e.g., Mezzacappa v. Astrue*, 749 F. Supp. 2d 192, 199 (S.D.N.Y. 2010) (holding that there was insufficient evidence to support a finding of light work, despite examinations showing the claimant had a normal gait.).

Lastly, the ALJ overstated Plaintiff's statements concerning her activities of daily living to justify her ability to walk and lift. [R. 17.] In general, the ALJ has discretion to resolve conflicts between the medical evidence and a claimant's activities of daily living. *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 492 (S.D.N.Y. 2018). However, there were no inconsistencies here between Plaintiff's daily activities and her ability to function. Plaintiff stated, and her medical providers opined, that she was limited in her ability to shop, clean, cook, and even put on her own socks and shoes. The ALJ's vague reference to Plaintiff's ability to perform various

activities was greatly overstated. [R. 17, *cf.* R. 51-54.] *See, e.g. Craig*, 218 F. Supp. 3d at 265

n.12 (finding that the ALJ overstated the claimant's abilities to perform activities of daily living

when she testified that she required help when shopping and using public transportation).

Accordingly, the ALJ's finding that Plaintiff could perform the full range of light work,

particularly concerning Plaintiff's ability to lift and walk, was against the weight of the record

and not supported by substantial evidence.

### E.   The ALJ's Mental RFC Finding Was Not Supported by Substantial Evidence

The ALJ's finding that Plaintiff had no mental limitations was also unsupported by

substantial evidence and against the weight of the record. [R. 14.] Even though the ALJ found

that Plaintiff had no severe mental impairments at the second step of the sequential analysis, she

was still obligated to assess the effects of Plaintiff's non-severe mental impairments when

determining her RFC. *Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (finding that

the ALJ erred by failing to account for any limitations arising from the claimant's mental

impairments, even after finding that those impairments were not severe). The record as a whole

does not substantially support the ALJ's finding as to the absence of any mental impairments.

Plaintiff had received psychiatric treatment for approximately two years with Dr.

Goldstein. [R. 592, 595-630.] This treatment followed years of references to Plaintiff's anxiety

and depression by Plaintiff's doctors. [see, e.g., R. 317, 448-49.] Dr. Goldstein opined that

Plaintiff's psychological impairments would frequently interfere with her activities of daily

living, and that she could not participate in work related activities. He further opined that she

had moderate limitations in her ability to understand and remember complex instructions,

maintain attention and concentration, interact appropriately with others, and perform low stress

and simple tasks. [R. 581.] These findings would support a finding of at least some mental limitations.

Nevertheless, the ALJ gave Dr. Goldstein's opinion little weight, in contravention of the treating physician rule. The ALJ relied, in part, on Dr. Noia's opinion. [R. 17, referring to R. 507-10.] The ALJ's characterization of Dr. Noia's opinion was incorrect, and the ALJ expressly ignored the portions of Dr. Noia's opinion that contradicted the RFC. [R. 17 ("Some weight is given to Dr. Noia . . .. Less weight is given to that portion of the opinion which found moderate limitations . . ..")]. Here, the ALJ cherry-picked the medical evidence to conform to her desired RFC. Dr. Noia actually opined that Plaintiff had moderate limitations in her ability to deal with stress and found that her impairments may significantly interfere with her ability to function on a daily basis. [R. 510.] This assessment supports Dr. Goldstein's findings and, therefore, does not provide substantial evidence to override Dr. Goldstein's treating source opinion.

The ALJ fails to provide any other valid basis to overturn Dr. Goldstein's opinion. The ALJ makes a vague reference to "conservative treatment," and makes no reference whatsoever to Plaintiff's years of psychiatric treatment. [R. 17, cf. R. 595-630.] She again refers to Plaintiff's "wide range of daily activities," even though Plaintiff was limited in her ability to perform activities of daily living due to both physical and mental limitations. [R. 17.] She references a lack of clinical findings, again disregarding the consistent clinical findings showing mental limitations and symptoms. In addition to both Dr. Goldstein's and Dr. Noia's records, Dr. Gapay and Dr. Hansraj found psychological impairments, including anxiety, depressive symptoms, and trouble sleeping. [R. 317, 437, 482, 568-71.] Taken together, these records do not substantially support the ALJ's finding.

Lastly, the ALJ relied on what might be a misrepresentation of an assessment by Dr. Bruni, a state agency psychologist. [R. 16, *referring to* R. 101-11.] Dr. Bruni reviewed Plaintiff's file on April 23, 2015 and found, based on the records before him at the time, that there was insufficient evidence to find a severe mental impairment. [R. 105-06.] The ALJ states that Dr. Bruni found, "based on an evaluation of the record," that Plaintiff's mental impairments were not severe. [R. 16.] This characterization is disingenuous. Dr. Bruni did not have a complete record, and he did not evaluate the record that was before the ALJ. In fact, he did not have the opportunity to review any of Plaintiff's mental health treatment records. His April 23, 2015 assessment predated the very first visit Plaintiff had with Dr. Goldstein, which did not occur until January 22, 2016. [R. 595.] The ALJ's interpretation appears to suggest that Dr. Bruni reviewed "the record" that was before the ALJ, and, therefore, disagreed with Dr. Goldstein's assessments, which is factually incorrect. Dr. Bruni's assessment, taken out of context, does not constitute substantial evidence to override Dr. Goldstein's opinion. Accordingly, the ALJ's finding as to Plaintiff's lack of mental limitations was not supported by substantial evidence.

F.    **The ALJ Failed to Develop the Record**

It is well established that the Commissioner is obligated to develop the record, even where a claimant is represented by counsel at the administrative level. *Mezzacappa*, 749 F. Supp. 2d at 204. Social Security disability determinations are non-adversarial, and the Commissioner's obligations are investigatory and inquisitorial in nature. Therefore, it is the ALJ's duty to investigate and develop the facts and arguments both for and against a claimant. *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005). To that end, the ALJ is obligated to affirmatively seek out additional evidence to

fill "obvious gaps in the administrative record." *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 267 (S.D.N.Y. 2016).  The ALJ failed to do so here.

The record contained no updated functional assessments of Plaintiff's ability to perform physical work-related activities from Plaintiff's treating sources during the relevant period.  The ALJ correctly noted that the only physical functional assessment from a treating source came from Dr. Gapay predating the relevant period.  [R. 17, referring to R. 450-53, 461-67, 568-71.] The absence of updated functional assessments during the relevant period from treating sources constitutes an obvious gap in the record which the ALJ was obligated to remedy.  *DeJesus v. Comm'r of Soc. Sec.*, No. 13 Civ. 2251 (AJN)(HBP), 2014 WL 5040874, at \*15 (S.D.N.Y. Sept. 29, 2014) (finding that the ALJ's failure to obtain updated functional assessments from treating sources constitutes a gap in the record and violated the ALJ's duty to develop the record).

## V.  CONCLUSION

For the forgoing reasons, Defendant's motion is **DENIED**.  The Court remands this case for further administrative proceedings.  The Clerk of the Court is directed to terminate the pending motion [Dkt. 20.] and close this case.

Dated: January 4, 2021
White Plains, New York

SO ORDERED

Paul E. Davison
United States Magistrate Judge